Panel's oral arguments for the week. As you all probably believe, and I will say from here, we saved the best for last. We will probably take a break after the first three arguments for a short period of time, and then hear the final two. Most of you have probably argued here before, be aware of our lighting system. The red light that comes on really does mean stop, so be aware of that. If you're answering somebody's questions at that time, though, do go ahead and finish answering the question. The only other remark I will make is that rebuttal is for rebuttal only, so don't save something on the appellate side just for rebuttal. Appellee may not save you in allowing you to bring it up. So I call the first case of the morning, if I can find my docket, United States v. Mazkouri. Good morning, and may it please the Court. My name is Matt Hennessey, and my partner David Gerger and I represent the defendant appellant, Dr. Riyaz Mazkouri. Dr. Mazkouri was convicted of conspiracy to commit health care fraud and five counts, substantive counts of health care fraud, and sentenced to 150 months. And to begin with here, I'd like to use my limited time to first address our fourth issue, the issue of sentencing, and specifically the issue of loss. This case is controlled by this Court's opinion in United States v. Roussell. That case is cited in our brief at page 44 and at 705 Fed Third 184. The Roussell Court held that a downward variance, even a substantial one, does not cure an incorrect guidelines calculation. And as the Court said, and I quote, we cannot assume the district court would not have granted a variance from the correct range. And it bears dwelling on the facts of Roussell. It's worth talking about those facts. So the Roussell, the district court, what originally happened in the district court, the original guidelines level was set at level 38, with a punishment range of 235 months to 293 months. The court sentenced Roussell to 136 months, a 99-month variance down. On appeal, this Court found level 38 was wrong, that the correct level was level 32, with a range of 121 to 151, putting the sentence squarely in the middle of the correct sentencing guidelines. Nevertheless, this Court did not assume that the court would not have varied further down, starting from the correct guideline level, in that case, 31. And interested in the ultimate outcome, went on page here and looked. The district court on remand sentenced Roussell to 96 months, so 40 months below the original sentence and 25 months below the correct sentencing guidelines. And so here what we're saying is the error in the district court here was at least as apparent as that in Roussell, warranting the same result. Was there any language by the district judge in that precedent similar to what was said here, an indication that the judge thought this was the correct sentence? She was not going to be concerned about some of the matters that you're raising with us now, about how much loss there was. Isn't that statement in the sentencing? In sentencing in Roussell? No, here. Well, no, she was concerned. In our case, she was concerned with the loss. She even said that the starting point, so she, pardon me, the district court said that in setting the guidelines level 43 and a corresponding beginning point of 720 months, the court said that's the beginning point and her variance was going to be, go down from there. So here What we see in a lot of sentencing, whether it's by district judges, is that if there's a statement in the sentencing that does support that this was the sentence that would be given regardless of the guideline calculation, that that can remove any effect of an improper calculation. Isn't there a statement like that in this case? No, there's not, Judge. No, no, there's not. The basis of the variance was a comparison to another case, but again, the court said that she was beginning, the court was beginning at 720 months. That was her starting point. And here's where the error is in that starting point. So the level originally set was level 43. That was based on, to begin with, that named patients in the indictment, extrapolating to 36 patients who lived at the same nursing home as the five patients. From there, the court jumped to 993 patients who were seen at Riverside, and in the end, the court sentenced based on 2,800 patients. 1,800 of those 2,800 patients were never at Riverside. There is no evidence of any fraud anywhere other than Riverside in this record. And it's those 1,800 patients I want to focus on here. Those 1,800 patients, the total amount received by Dr. Muscuri for those, let me flip that. So the total amount of fraud at Riverside was 892,000, 892,000. The pre-sentence report at paragraph 59 attributes 4.5 million to Dr. Muscuri. That's what he received in connection with fraud. The reason that the way the court got there is by lumping Riverside patients together with non-Riverside patients. When you separate those out, Dr. Muscuri received 892,000 for Riverside patients, but the district court attributed 3.6 million for non-Riverside patients. The level 43 set by the district court was based on a finding of 23 million. You remove the non-Riverside patients, you get to less than 20 million in loss. And mind you, just to anticipate, there's more error here than just this, but this gets to the Roussell point, where the starting point should have been lower to begin with. So you pull out the 3.6 million from the 23, you're below 20. That takes one point off the guidelines. That makes all the difference. How does taking one point off make all the difference if she makes a downward variance to 150 months? First, the difference is this. The one point off drops the guidelines by half, from level 43 to level 42. Level 43 is 720, striped spirit. Level 42 is 360 to life. He got 150. He got 150. But again, back to Roussell. What matters is the starting point, not the point where the district court wound up. The starting point here was wrong because of the 1800. Well, can we have a different loss amount question? So my understanding is that Mr. Muscuri's argument, or I'm sorry, Dr. Muscuri's argument, is that the actual loss amount should be 500 and something thousand dollars because that's the losses associated with the, is it two counts in the indictment or five counts in the indictment? There's six counts total, five substantive counts where they named actual patients. Do you have any authority from any court in the United States that says when calculating the actual or intended loss for purposes of the sentencing report that you only use the charged counts? No, and that's not what the law is. So I don't understand what the purpose would be of the $536,000 number. That is the absolute bare minimum. Absolute bare minimum because that is what was tried. We tried the five patients. That's what the court heard the most evidence about. That's the bare minimum. What we say the maximum is, what we say the maximum is on this record is the 36 patients who came from the same nursing home and that's $1.5 million loss. But I thought the entire purpose of these loss calculations was to make a reasonable estimate of the actual or intended loss. It's all about estimates and it's reasonableness, right? You're getting to my punchline. Sure. What we say here is that the district court was unreasonably indiscriminate and that's why I began with the 1,800 out of the 28. That's the most glaring example of being unreasonably indiscriminate, punishing a defendant for patients who were never at the, at Riverside. Right there is the beginning point. Then we go to, okay, five patients at trial. But recall that we also presented at sentencing four patients who were not demented. That was the underlying theory of the case is that these five patients were demented, completely unqualified for PHP services, could not benefit from them. At sentencing, we presented four undemented, deserving patients who themselves and their family members said benefited from treatment at Riverside. We also showed at sentencing that the average age, the average age of the five patients in the indictment was 80 years old. The average age of everybody else treated by Dr. Muscuri was 60. And by the way, as to the five patients, the term of conspiracy was from 2006 to 2012. The first of these five patients, the first of the five patients in the indictment did not get to Riverside before 2009. So half of the conspiracy, we didn't have anybody who was admitted improperly. Were you trial counsel? We were not. Okay. But trial counsel did, I'm, I'm thinking of the 10 or more victims characteristic and trial counsel didn't object to that characteristic, correct? I think that's right, yes. Okay. So we would only review that for a plain error on appeal if it was forfeited? Well, and this gets back to my answer with Judge Oldham. So the minimum number here is, is five. We say the maximum is 36. Now, where we wind up there, I don't know if, if we get back to the district court, but we're asking to do here is get back to the district court and request the district court to do expressly what the, what the district court expressly said it would not do, which is parse the patients. Let's, let's, let's have a sentence, a reasonable estimate of what the loss was to begin with, to eliminate the 1800 patients, lower the starting point. Remand is warranted. Bar son is obviously precedent we're bound by. And as I recall, your brief didn't argue about the legal correctness of it again, we're bound by it, but unless I overlooked it, I don't think your brief mentioned anything about the correctness of Bar son. I don't recall it. We didn't know. So as, as I said already, we say that the, the district court sentence was unreasonably indiscriminate. The correct guideline level should be no more than level 36 based on 1.5 million, which is the district court sentence. Remand is warranted. Turning now to our first point, which involves the summaries, summaries of these massive Medicare bills. These, what I'm talking about here is two Medicare bills. One has 500,000 lines of data. Another has 130,000 lines of data, all condensed into, let's say, a dozen summary exhibits presented by the case agent. And contrary to what the government says in its brief, cross-examination and jury instructions can't make inadmissible evidence admissible. Cross-examination and jury instructions, that can't make false evidence true. And that's what happened here. These summaries were inaccurate for the same reason, at least in part, as the district court's error, the district court's mistake in including the 1,800 patients. The case agent's error in the summaries was including patients that was never paid for. Let me explain that a little bit. Dr. Muscuri entered into a reassignment of benefits contract with a mental health provider called Cadwalder Mental Health. Cadwalder billed independently from Dr. Muscuri. Dr. Muscuri had a plan of care for patients. Cadwalder was then charged with carrying that plan out. Cadwalder billed separately for that. The reassignment of benefits contract is in evidence as Defendant's Exhibit 14. The reassignment of benefits contract is in evidence, excuse me, agreement, is in evidence in Governance Exhibit 2 and Defense Exhibit 7. When you pull out the Cadwalder billings that Dr. Muscuri did not bill for and he was never paid for, what happens is it's a very different picture. Rather than having something like 47, 100 patient days, there were zero. Rather than earning 4.5 million, Dr. Muscuri earned 892 from Riverside and more from non-Riverside patients. But what came through again and again and again through the use of the exhibits and in argument and in questioning with witnesses was the mistaken impression that Dr. Muscuri billed for and received 4. million when that Good morning, Honors. Paul Crane on behalf of the United States. Let me start with the first issue about the summary charts and just try to resolve any potential confusion about what they did and did not represent. So with respect to the Cadwalder claims or is referred to as the Cadwalder claims in the briefs, the summary charts are relying on the underlying Medicare data, which was admitted over the defense's objection, but they don't pursue that on appeal for Governance Exhibits 3 and 5. Specifically, Governance Exhibit 5 was all the information that was billed or caused to be billed by Dr. Muscuri under his Medicare provider number. There is a subset of those claims that were under, at least the representation is Cadwalder's personal PIN, this 8J009 number. First of all, it is not entirely clear from the trial record whether that number is in fact Cadwalder's. If you look at the record on Appeal Page 7135, where there is a termination of the reassignment of benefits, that number appears to be associated with Dr. Muscuri, which is part of Government Exhibit 2, which was before the jury. But more to the point, this reassignment of benefits, while it is paid for those services, the representation is that he was the provider of those services. And all the summary charts were saying, and the inference that is in the summary charts, is that for representations that he was the one providing the services, that he would necessarily be at the site. The charts indicate that for most of those days, three or more service locations is where Dr. Muscuri on those days was providing services. The representation, you mean, is just the use of his provider number in the submission of those bills? I'm sorry? How does that representation appear in the record? Is it that his provider number is being used? Yes. So the underlying, the representation in the record is that there is an agreement between Dr. Muscuri and Cadwalder, in which Cadwalder would, that they would be the ones that would receive the benefits from Medicare for the services that Dr. Muscuri provided. On sentencing and on appeal, it's now for services incident to Dr. Muscuri's services. But it's still under Dr. Muscuri's provider number, and instead of Medicare paying Dr. Muscuri, they would send the payments to Cadwalder. But the underlying inference and assumption, which the government thinks is the best and most reasonable reading of the record at trial, is that Dr. Muscuri was at Cadwalder, or at least representing that he was at Cadwalder, because he was the one providing the services or supervising the services. Let me make sure I understand the source of the fraud. Is it that these bills were his number? Weren't they submitted with Cadwalder's number as well, is what I understood from the plaintiff's brief. You say somewhere in your brief that he had an obligation to Cadwalder to provide the initial psychiatric evaluations of patients, which seems like a contract requirement, not a Medicare fraud requirement. So how was, what was Medicare told in these bills that was fraudulent? Well, the Involving Cadwalder. So for purposes of trial, the summary charts, there isn't, there doesn't need to be any allegation of fraud for the summary chart, for the reason and the inferences that the government's theory on the summary charts. Because the summary charts are trying to represent either days or patients in which it was represented to Medicare that Dr. Muscuri was the provider, or I'll use that. What was the misrepresentation to Medicare involving the billing that Cadwalder also had its Medicare number on? At trial, the government didn't allege that there was any fraud or misrepresentations relating to that data, but rather that Dr. Muscuri was either billing or causing to be paying patients or was otherwise supervising services at Cadwalder. So not that necessarily, the data underlying the charts and the charts themselves aren't making an assumption that there was fraud at Cadwalder, but rather that there was a representation that services were being provided by Dr. Muscuri at Cadwalder on certain days. That may be fraudulent and may not, but for purposes of looking at particular dates and seeing how many patients were being provided services by Dr. Muscuri, or at least he was the supervising attending physician, that was all the charts were offered for. Now, the inference that then the government was asking the jury to draw is, well, wouldn't it have been feasible to see that many patients, for example, in a given day? But the allegations of fraud for purposes of trial were focused exclusively on Riverside. Let me ask you this way. Why is the billing to Medicare indicating that he personally was involved in all of these patients? How do you get there? So, with respect to Cadwalder? With respect to Cadwalder. So, the way we get there is, for the reassignment of benefits, there's sort of, I guess, two theories that the defense has offered for why it was permissible for Cadwalder to receive those benefits under Dr. Muscuri's provider number. One would be if he was himself providing the services, but has assigned the payments from Medicare, instead of going to one actually providing the services. The one that was more of the focus at sentencing and on appeal is that the services by Cadwalder were incident to his, the services he was otherwise providing. But even under that theory, under the sort of applicable Medicare guidelines, Dr. Muscuri needed to be on site when those services were performed, even if he wasn't doing the face-to-face interaction with the patients, he needed to be available at Cadwalder, because there's an exception if you're a hospital, but there's no evidence at all in the record that Cadwalder was a hospital. So, either way, the representation just on the Medicare data is that Dr. Muscuri was present at Cadwalder. Now, that may or may not actually be true, but that's what the from Cadwalder. All right. And so, in light of that, that, and this was all subject to cross-examination by the defense quite extensively. If you look at record pages 1872 to 1908, this was all done before the jury. And even if you take out all these claims under this 8J009 number, there are still implausibly high number of patients, at least according to the data, that are being seen by Dr. Muscuri at Riverside alone. For example, and this was part of the cross-examination, if you look at 1883 to 1887, at least 40 patients, in one instance 80 patients, and there's other evidence in the record that Dr. Muscuri would be at Riverside for only 90 minutes or two hours at a time. And the idea of being able to see 40, 45, 80 patients is certainly implausible. Even if there were error with the charts, which, again, under an abuse of discretion standard, the government would submit there is no error and certainly not an abuse of discretion by the district court admitting these charts, which were subject to cross-examination and had a limiting instruction given to the jury that they had to decide how much weight to give it, any error would be harmless for the pervasive evidence of fraud. And that pervasive evidence of fraud is also relevant to the sentencing guidelines calculation issue. And so unless there was questions on this first issue, I would move to the guidelines calculation. Let me ask. We see a lot of cases dealing with representative samplings of victims or other, whatever the other large-scale sort of criminal activity may have been. You just look at a sampling of it. I find this a particularly small sampling of actual patients. I know there's at least one other case that's come up from this particular prosecution dealing with another defendant. What do you say to that? Isn't five an unusually limited number of actual examples of people who you want to say are exemplars of the kind of conduct that you're criminalizing? So I guess the way I would answer that, Your Honor, if I understand the question correctly, is if it was simply just the information about these five patients and their patient files and treatment alone, that would be small and unusually small. I know there's a lot of other evidence you have put in. I'm not trying to displace that. Yes, sir. But I just thought that the five, the specifics of only five patients seemed to be a very small sampling, and it has the kinds of problems that have been raised by your friend on the other side of just how representative are they, and, in fact, are there a lot of patients that do not have that sort of, have had no benefit they could possibly receive from this treatment? You have treated everybody, it seems to me, who is in these facilities for the six-year period that Dr. Mascuri saw as part of the Medicare criminal activity. That's correct, Your Honor. The showing of pervasive fraud, which the district court also found at sentencing that there was systemic manipulation by Dr. Mascuri, is to then establish at least the presumption that all of the Riverside-related billings. You're right that in other cases the government at sentencing has given more examples of specific patients than they did at sentencing in this case, but that doesn't take away the finding by the district court and the tremendous amounts of evidence of systemic fraud that was taking place at Riverside to establish the presumption that all of the Riverside billings were fraudulent and leaves it to the defense to try to rebut that presumption. And while the defense does come forward with examples of patients who did not suffer from the type of Alzheimer's or severe dementia that might make them ineligible, that wasn't the only type of fraud alleged or that was going on at Riverside. There was the type of fraud where patients were ineligible, but there was also fraud for whether the services were medically necessary, whether the services were resulting in improvement in any patients, billing for services that didn't take place. Even of the four or five examples that the defense offers, two of those patients were billed for services by Dr. Mascuri for when he was out of the country. So it doesn't mean that they are free from fraud. They just might not be the precise same type of fraud as the substantive counts that were at issue in the indictment. And so the finding by the district court that there was systemic manipulation and fraud at Riverside and therefore the establishment of pervasive fraud through all the evidence that government introduced at trial, which is really significant, I think quite comfortably establishes that with respect to Riverside, all of the amounts billed by Riverside where Dr. Mascuri was the attending physician and all the amounts billed by Dr. Mascuri for his Riverside work are subject to loss. And that amount actually is in and of itself quite significant. So what the PSR found and the district court found was that of the $22.9 million loss, $18.4 million of that is for billings done and received by Riverside. And given that under the 2016 guidelines, the 20-point enhancement that the district court gave is for a loss amount between $9.5 million and $25 million. So even if you just want to look at only the Riverside, that's still $18.4 million results in an enhancement of 20, which is what happened here. So there's no error that would even, even if there were error, that would lead to a change in the enhancement or the guidelines range. And so, and that doesn't even touch the billings that Dr. Mascuri did under his own provider number, some of which were with Riverside, some of which were subject to the reassignment of benefits by Cadwalder. And so the government would submit that there was no error in the loss amount, that the $22.9 million was the accurate amount. But even if it's a little bit less, even if you wanted to take the $1.9 million out that's associated with Cadwalder, there is no change to the guidelines range. It would still be above $20 million. It would still be comfortably between the $9.5 million and $25 million. How do you respond to the opening argument by opposing counsel that the downward variance is not going to cure any possible miscalculation in the guideline? So, Your Honor, there is not, we would agree that there's not an explicit statement by the district court where she says, regardless of the guideline range, this is the sentence I would impose. That said, I think the best and most reasonable reading, and particularly if you focus on page 2472 of the record, is the district court was certainly nudging counsel that, regardless of what the precise loss amount was going to be, she indicated that she was already going to give a substantial downward variance. And so the government thinks the best reading of the record is that even if there was a different guidelines range, the court was still going to issue the same sentence, but does acknowledge that there isn't an explicit sentence that's crystal clear on that. It seems to, I'm looking at 2472. She says this whole debate about the guidelines calculation is, quote, largely futile, and that she had already decided that she was going to make a downward variance. So I don't see, I mean, that seems pretty explicit to me that she was going to impose the variance and say 150, whether it was $22 million or $69 million or $20 million. That, we agree with that reading, Your Honor. All I was trying to say is the sort of maybe magic word sentence isn't there, but I don't think the government, you don't need some magic words to be able to read this transcript and see that it's pretty clear coming off the page that this sentence of 150 months was what was going to happen regardless of the precise guidelines amount. You have a case from this circuit that makes that reasonable analysis? Aren't our cases all looking for magic words? Yes, Your Honor. We don't have a case that has that very small leap. At the same time, the government doesn't think it would be inconsistent, but our primary submission is that there was no error in the guidelines range in the first place, and even if the court were going to take issue with any small part of the loss amount, which again, the government thinks it should not, it wouldn't change the guideline range because the primary source of reducing the loss amount would be this $1.9 million associated with the reassignment of benefits, and that just simply doesn't change any of the enhancements that were at issue. And so the same guideline range and calculation would exist, and in light of that and in light of pretty close to explicit language, the sentence would have there's confidence that the sentence would have been the same regardless. If there are no further questions. All right, counsel. Thank you. Thank you. What I just heard is that the government inviting this court to assume that the sentence would have been the same if the starting point were lower. Purcell says we can't do that. It's not about magic words. It's about recognizing the error first. And it's not 1.9. It's 3.6. 1,800 patients equals $3.6 million. $3.6 million gets us less than 20. 20 gets us one point. That one point makes all the difference. Cuts that you have. Can you help me with your understanding of Purcell? Because I'm looking at it. Yes. In the way I understand our opinion in this case, the district judge says the guidelines themselves came to an unreasonable result, so therefore I'm going to grant a downward variance. And so this seems to be like a lot of the things the Supreme Court of the United States has said, which is where the district judge's sentencing decision is anchored somehow to the guidelines calculation. That is, in this case, it's 136 months, right? That sentence and the variance associated with it is anchored to the guidelines. Therefore, the guidelines really matter. Whereas if the district judge says, well, I think I'm going to make a variance and I think 150 is the good sentence, regardless of these, you know, fighting about 20 million versus 18 versus 22 million on the loss amount, it seems different. Is that my misunderstanding, your reading of Purcell? Well, I don't know about that. I mean, Purcell says we can't assume that the sentence would be the same from a different starting point. But back to the process of sentencing, the process of sentencing is first. Set the guideline. Second, is there a reason for departure? And these days with advisory guidelines, that's only with cooperators for the most part. Three, is there a basis for variance? You can't get here. We didn't get it. The district court didn't get the first one right. So the variance, and that's really what Purcell says, that if you don't get your starting point right, a variance doesn't fix it. And we go back. So I don't know if that answered your question directly. But, no, Purcell says we just can't make the assumption, which is what I hear the government inviting this court to do. And back to the summaries. The summaries say, and the government used the summaries to again and again and again pound on the jury, that Dr. Muscuri made $4.5 million from fraud. He made $892,000 from Riverside. The rest is non-Riverside. There is no fraud. It was inaccurate to lump all the non-Riverside stuff into the summaries It misled the jury. Taylor is the case. I cited about this. We cited about this. In Taylor, what they did is they put a picture of a woman in an organizational chart, which misled the jury as to the degree of her culpability. Not guilty versus not guilty, just how involved, how culpable was she? That inaccuracy was sufficient to find error and sufficient to reverse because of the misleading nature. And here, I say this is even more serious than what happened in Taylor because have a look at these spreadsheets, Governments Exhibit 3, Governments Exhibit 5. They are massive. There is no way a juror can understand them. It's impossible. The primary evidence, I say, in a case like this are these summaries. If the summaries are misleading, we don't have anything. What do we have? And these summaries are coming from not just some paid expert where you can tilt at him or her based upon, oh, you're a gun for hire. These summaries came from the case agent, a 13-year veteran of the FBI, 11 years in health care fraud, all presented to the jury. And that agent said, Dr. Muscuri made $4.5 million out of this fraud. Dr. Muscuri worked, saw 100 patients a day on 47 different days. That wasn't true. That overstated any culpability that was error and it was harmful. Thank you. Thank you. Thank you both for your presentations today. We'll take this case under advisement. I'll call the next case.